IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LISA M. PEARSON, | ) | 8:11CV83 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| MICHAEL J. ASTRUE, | ) | |
| | ) | |
| Defendant. | ) | |

In this social security appeal, plaintiff Lisa M. Pearson ("Pearson") argues that the Commissioner of Social Security committed reversible error in determining that she is not entitled to disability insurance benefits. For the reasons discussed below, the Commissioner's decision is reversed and remanded.

**A.    Background**

On August 22, 2006, Pearson filed an application for disability insurance benefits. (Tr. 16, 114-16.) In her application, Pearson alleged that she has been disabled, and has not been able to perform substantial gainful activity, since August 11, 2006.[1] (Tr. 16.) Pearson's application was denied initially and on reconsideration. (Tr. 16, 52-55.) On April 9, 2009, an administrative law judge ("ALJ") issued a decision finding that Pearson was not disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. 16-27.) In his decision, the ALJ followed the five-step sequential analysis prescribed by the Social Security Regulations to evaluate Pearson's disability claim.[2] *See* 20 C.F.R. §§ 404.1520, 416.920. The ALJ found as

---

    [1]Pearson originally alleged that her disability onset date was December 1, 1998. (Tr. 16.) However, through her attorney, Pearson amended her alleged onset date to August 11, 2006. (*Id.*)

    [2]The Social Security Administration uses a five-step process to determine whether a claimant is disabled. These steps are described as follows:

follows:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

2. The claimant has not engaged in substantial gainful activity since August 11, 2006, the amended alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: migraines and depression (20 CFR 404.1521 et seq.).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

---

At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she would need a lower stress level job, such as a level 4 with 10 being the most stressful; she should have no contact with the general public and only limited contact with fellow workers; and she can never work at heights or on ladders.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on September 23, 1979 and is defined as a younger individual on the amended alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569a and 404.1568(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 11, 2006 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 16-27.) After the ALJ issued his decision, Pearson filed a timely request for a review hearing with the Appeals Council of the Social Security Administration. (Tr. 12.) On January 5, 2011, the Appeals Council denied Pearson's request for review. (Tr. 1-4.) Thus, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

**B.      Standard of Review**

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Id.* at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. *Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995).

**C.      Medical History and Opinions**

*1.     Dr. Ruggle*

In January 2005, and throughout 2006, 2007, and 2008, Paul Ruggle, M.D., provided primary healthcare services for Pearson. (Tr. 358-85, 469, 78-97.) In February 2005, Pearson visited Ruggle for depression and anxiety. (Tr. 372.) Ruggle

increased her Paxil dose and instructed her to stop smoking. (*Id*.) In June 2005, Pearson visited Ruggle complaining of depressive symptoms. (Tr. 370.) Ruggle gave Pearson medication for her symptoms and suggested that she make an appointment with a psychiatrist. (*Id*.) At the end of July 2005, Pearson visited the emergency room complaining of a migraine that had lasted four days. (Tr. 303.)

In early November 2005, Pearson visited Ruggle complaining of a sore throat and "a little bit of headache." (Tr. 367.) Ruggle determined that Pearson had a viral infection, directed her to take Tylenol and suggested she continue good fluid intake. (*Id*.) In late November 2005, Pearson visited Ruggle for a physical. (Tr. 366.) Ruggle noted that Pearson had migraines and symptoms of anxiety and depression. (*Id*.)

In mid-April 2006, Pearson visited Ruggle complaining of a right-sided headache that had lasted 17 hours. (Tr. 364.) Ruggle provided Pearson with a prescription and asked her to return in one month to follow up on her headaches. (*Id*.) At the end of April 2006, Pearson visited the emergency room for a migraine headache. (Tr. 304.) Pearson followed up with Ruggle a few days later. (Tr. 363.) During the follow up, Ruggle discouraged Pearson from smoking and indicated that her migraine medication seemed "to be working as she increase[d] the dose." (*Id*.) Pearson subsequently visited Ruggle for migraine headaches in late May, June, July, August, September and December 2006. (Tr. 358-62, 489, 491) Ruggle continued to advise Pearson to stop smoking. (*See* Tr. 358.)

Between January 2007 and April 2008, Pearson visited Ruggle's office for healthcare services numerous times. (Tr. 469-91.) In March 2007, Pearson visited Ruggle complaining of migraines, sleep problems and fatigue. (Tr. 483.) Ruggle noted that Pearson was still smoking and that she argued that she could not afford smoking cessation medication. (*Id*.) Ruggle informed Pearson that if she could afford cigarettes, she could afford smoking cessation medication. (*Id*.) In February 2008, Pearson underwent a computed tomography ("CT") scan. (Tr. 480.) The CT scan

5

revealed two nonspecific calcified densities, but was otherwise negative, and revealed no findings to explain Pearson's headaches. (*Id*.)

On March 10, 2008, Ruggle completed a "Headaches Residual Functional Capacity Questionnaire." (Tr. 461-65.) In this questionnaire, Ruggle listed Pearson's diagnoses as migraine headaches and depression. (Tr. 461.) Ruggle described the frequency of Pearson's headaches as "weekly." (Tr.462.) He also indicated that Pearson would need to take an unscheduled break from an eight-hour work day once a month, and that she would be absent from work as a result of her impairments once a month. (Tr. 464-65.) Overall, Ruggle thought Pearson's prognosis was "good," and that she could perform low-stress jobs. (Tr. 463-64.)

  2.   *Dr. Koenen*

Between December 2005 and August 2006, Pearson visited Dr. Jay A. Koenen, at Koenen Chiropractic, for back pain on numerous occasions. (Tr. 308-37.) During several of her visits, Dr. Koenen noted Pearson's headache complaints and indicated that her "[c]omplicating problems include[d]: cephalgia/headache." (*See* Tr. 310-13, 324-25, 327, 337-38, 340, 344, 346, 349, 351, 354).

  3.   *Dr. Martin*

In October 2006, Richard A. Martin, Ph.D., examined Pearson's mental status. (Tr. 387-90.) During the examination, Pearson reported that she was attending community college and taking courses in accounting. (Tr. 387.) Pearson said she was able to complete all self-care tasks independently and listed her household chores as "cleaning, dishes, laundry, take care of kids." (Tr. 389.) Martin provided the following impressions/recommendations:

> Ms. [Pearson] appears to possess the cognitive abilities required to work within a wide range of simple unskilled vocational situations. She appears capable of understanding simple instructions and procedures. On

> the surface, her concentration/attention and memory abilities appear adequate for most simplified vocational situations; however, these abilities are likely to vary depending on her overall emotional functioning. Overall, results of this evaluation indicate that her judgment abilities, particularly within social situations, are generally intact. Given her ongoing depression and migraine headache complaints, she appears likely to experience occasional problems with workplace performance and motivation. In general, she appears to have adequate social skills to appropriately handle interactions with supervisors, co-workers, and the public.

(*Id*.) Martin indicated that Pearson appeared to meet the criteria diagnoses of major depressive disorder, recurrent. (Tr. 389-90.)

　　4.　　*Dr. Lovell*

On December 11, 2006, Rhonda Lovell, Ph.D., filled out a "Psychiatric Review Technique" and a Mental Residual Functional Capacity Assessment ("RFCA") regarding Pearson. (Tr. 401-14.) Lovell indicated that Pearson was suffering from depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, and difficulty concentrating or thinking. (Tr. 404.) In the Mental RFCA, Lovell indicated that Pearson's ability to maintain attention and concentration for extended periods, and her ability to perform activities within a schedule, were moderately limited. (Tr. 415.)

　　5.　　*Dr. Kakade*

In January 2007, Neeraja Kakade, M.D., performed a psychiatric evaluation on Pearson. (Tr. 425-27.) Kakade diagnosed Pearson with a dysthymic disorder and borderline personality disorder. (Tr. 426.) Kakade ruled out recurrent major depressive disorder. (*Id*.) Kakade discussed her findings, diagnoses and treatment with Pearson and noted that Pearson would undergo psychotherapy. (Tr. 427.)

Pearson subsequently attended two counseling appointments, but she failed to attend a third appointment on March 9, 2007. (Tr. 432-34.)

### 6. *Dr. Garfield*

On May 22, 2007, John Garfield, Ph.D., completed a "Psychiatric Review Technique" and a Mental RFCA on Pearson. (Tr. 438-55.) Like Lovell, Garfield indicated that Pearson was suffering from depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, and difficulty concentrating or thinking. (Tr. 441.) And, like Lovell, Garfield's Mental RFCA of Pearson indicated that her ability to maintain attention and concentration for extended periods, and her ability to perform activities within a schedule, were moderately limited. (Tr. 452.)

### 7. *Cindy Goshorn*

In March 2008, Pearson visited Nurse Practitioner Cindy Goshorn for a psychiatric follow-up. (Tr. 468.) At the follow-up, Pearson reported that her depression was ongoing, but with the addition of medication at bedtime, she was sleeping better. (*Id.*) Goshorn diagnosed Pearson with dysthymia disorder and borderline personality disorder. (*Id.*)

**D. Administrative History**

On January 29, 2009, the ALJ held a hearing regarding Pearson's claim for disability. (Tr. 28-51.) At the hearing, Pearson testified that she was 29 years old and had completed some college. (Tr 32-33.) Pearson stated that she lived in an apartment with her husband and five-year-old son. (Tr. 33-34.) Pearson was not currently working, but she had worked as a dietary aide for "Carriage of Newton" in 2006 and USA Healthcare in 2007. (Tr. 34-35.) Pearson said she quit working at

"Carriage of Newton" because she had a migraine and she was going to be written up. (Tr. 35.) She stated she was fired from USA Healthcare because of a conflict with a coworker. (*Id*.) Although Pearson indicated that her migraine medication worked "most of the time," she also stated she had migraines about "once a week." (Tr. 36-37.) Pearson said she was no longer able to work because she suffered from severe migraines and depression. (Tr. 36-37, 39.)

After Pearson's testimony, the ALJ asked vocational expert Julie Speck ("Speck") if a hypothetical person with Pearson's age, education and work experience could perform Pearson's past relevant work. (Tr. 46-47.) This hypothetical individual would have no exertional limitations, but would need a lower-stress level job, such as the level of four with 10 being the most stressful and one being the least stressful. (Tr. 47.) The individual would require a job with no contact with the general public and limited contact with fellow coworkers. (*Id*.) The individual could not work around heights or on ladders. (*Id*.) Speck answered, stating that this hypothetical individual could not perform Pearson's past relevant work. (*Id*.) However, Speck testified that the hypothetical individual's clerical skills and ability to use the computer would be transferrable, and therefore, the hypothetical individual could perform work as a gate guard (Dictionary of Occupational Titles ("DOT") 372667030), order filler (DOT 222487014) or file clerk (DOT 206387034). (*Id*.) The ALJ then asked if the hypothetical individual could perform any unskilled work. (*Id*.) Speck stated the hypothetical individual could perform work as a pricer or a tagger (DOT 229587018), a folder (DOT 3687018), or a sterilization clerk (DOT 599685018). (Tr. 48.)

When the ALJ finished questioning Speck, he asked Pearson's attorney if he had "any additional hypotheticals or questions." (Tr. 49.) Pearson's attorney said yes and asked Speck the following hypothetical question:

> We're going to do a third hypothetical with the same age, education, past relevant work experience, and I'm basing this on the statement of the consulting examiner to define that. I'll read his quote, and then I'm going to provide some definition for it. He said, "The individual would

9

occasionally have problems with workplace performance," and to provide a little specification of that, occasional defined by Social Security, would be one-third of the time the individual's performance at their job would not be satisfactory. With that as a hypothetical, could they do past relevant work?

(Tr. 49.) Speck responded, "No, she could not." (*Id*.) The lawyer then asked whether the individual could perform "other jobs" if the same limitations applied, and Speck responded: "It would not be possible." (Tr. 50.)

**E.     Discussion**

In her appeal brief, Pearson argues that the ALJ erred in denying her disability claims because he (1) erred in determining that Pearson's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with his RFC assessment, (2) failed to consider Pearson's husband's third-party statement, (3) failed to include all of Pearson's limitations in his RFC assessment, (4) erred in relying on vocational testimony that was inconsistent with the DOT, and (5) erred at step five of the sequential evaluation process. (Filing 14 at CM/ECF pp. 1-27.)   Defendant contends that substantial evidence on the record as a whole supports the Commissioner's decision. (Filing 15 at CM/ECF pp. 1-23.)  The court will explore Pearson's arguments in turn.

   *1.     Credibility*

First, Pearson argues that the ALJ erred in determining that Pearson's statements concerning the intensity, persistence , and limiting effects of her symptoms were not credible to the extent that they were inconsistent with his RFC assessment. (Filing 14 at CM/ECF pp. 12-14.)   To evaluate whether the ALJ erred in discounting Pearson's testimony, this court follows the standard set forth in *Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)*. In *Polaski*, the Eighth Circuit held that the ALJ must consider "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating

10

and aggravating factors; and functional restrictions." *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) (citing *Polaski*, 739 F.2d at 1322). An ALJ is not required to discuss each "*Polaski* factor," as long as the ALJ "acknowledges and considers the factors before discounting a claimant's subjective complaints." *Halverson v. Astrue,* 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009)). If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, courts will normally defer to the ALJ's credibility determination. *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008).

>     In making his RFC determination the ALJ specifically stated that he:

> [C]onsidered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 (incorporating and expanding upon Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)) and SSRs 96-4p and 96-7p.

(Tr. 21.) In addition, the ALJ considered opinion evidence "in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (*Id*.) After discussing opinion evidence from Martin, Wilson, Lovell, Kakade and Ruggle, the ALJ considered the *Polaski* factors and assessed Pearson's allegations. (Tr. 21-25.) The ALJ then concluded that Pearson's daily activities "were not limited to the extent one would expect, given [her] complaints of disabling symptoms and limitations." (Tr. 24.) In doing so, the ALJ noted that Pearson could take care of her children (with the help of her husband when needed), care for herself, cook complete meals two to three times per week, clean, do laundry, go to the grocery store, talk to her sister on the phone, communicate by email and play computer games. (*Id*.) The Eighth Circuit has held that acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility. *Heino v. Astrue,* 578 F.3d 873, 881 (8th Cir. 2009).

The ALJ also noted Pearson's failure to show up for several doctors appointments and her failure to follow Ruggle's repeated recommendation to quit smoking. (Tr. 24-25, 358, 359, 363, 432, 469-70, 482-83, 489, 471, 497.) "A failure to follow a recommended course of treatment weighs against a claimant's credibility." *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005); *see also Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) (stating an ALJ may consider a claimant's failure to follow a treating physician's direction to quit smoking when evaluating a claimant's credibility).

Reading the ALJ's opinion as a whole, the court finds that the ALJ considered the *Polaski* factors and provided a reasonable explanation for discounting Pearson's testimony. As such, this court defers to the ALJ's credibility determination.

### 2. *Failed to Consider Third-Party Statement*

Second, Pearson argues that the ALJ failed to consider her husband's third party statement. (Filing 14 at CM/ECF pp. 15-18.) This claims lacks merit. The ALJ specifically discussed Mr. Pearson's statement at step three of the sequential evaluation, stating:

> The claimant's husband indicated that she does not take care of the children very often, but will if she has to such as when he cannot be home. . . . The claimant's husband reported that the claimant wears sweatpants all the time, does not take a shower every day, does not do anything with her hair, does not shave very often, and does not cook much but will eat when he cooks. . . . The claimant's husband reported that she will put away clean laundry and she will go to the grocery store to purchase food and household goods. . . . The claimant's husband reported that the claimant does not do anything and she does not leave the house or have any friends. . . . The claimant's husband indicated the claimant cannot pay attention for very long.

12

(Tr. 19.) Indeed, most of this testimony is discredited by the same evidence that discredits Pearson's testimony. *See supra* Part E.1. Thus, even though the ALJ failed to specifically discredit Mr. Pearson's testimony, this deficiency in opinion-writing technique had no bearing on the outcome of Pearson's case. *See, e.g, Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011) (concluding ALJ did not err by failing to address a third party's statement where the same evidence that the ALJ referred to in discrediting the claimant's testimony also discredits the third party's statement); *Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995) (affirming the ALJ because "it is evident that most of [the third party's] testimony concerning [the claimant's] capabilities was discredited by the same evidence that discredits [the claimant's] own testimony concerning his limitations."); *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992) (concluding arguable deficiency of failing to specifically discredit witness has no bearing on outcome when the witness's testimony is discredited by the same evidence that proves claimant's claims not credible).

### 3. Failure to Include Limitations in RFC

Third, Pearson argues that the ALJ erred by failing to include all of Pearson's limitations in his RFC assessment. (Filing 14 at CM/ECF pp. 18-21.) More specifically, Pearson argues that despite assigning "significant weight" to Martin's opinion, the ALJ omitted Martin's conclusions that (a) Pearson is capable of "simple, unskilled work" with the ability to understand and follow "simple instructions and procedures" and (b) that, due to her depression, Pearson would occasionally have problems with workplace performance and motivation. (*Id*.; Tr. 389.) The court will address the impact of these omissions in turn.

#### a. Simple, Unskilled Work

"ALJs bear the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010). Here, the ALJ gave Martin's opinion "significant weight" and

13

did not discredit it. (Tr. 22.) In Martin's opinion, Pearson possessed "the cognitive abilities required to work within a wide range of simple unskilled vocational situations" and appeared "capable of understanding simple instructions and procedures." (Tr. 389.) Pearson argues that the ALJ's RFC finding should have included both an "unskilled" and a "simple" work limitation. (Filing 14 at CM/ECF pp. 18-21.)

Although the ALJ did not include an unskilled work limitation in his RFC assessment, he did address unskilled work in his hypothetical questions to the vocational expert. (Tr. 47-48.) When asked whether a hypothetical individual with Pearson's age, education and work experience could perform "unskilled work," the vocational expert testified that the individual could perform "unskilled work" as a pricer or a tagger (DOT 229587018), a folder (DOT 3687018), or a sterilization clerk (DOT 599685018). (*Id*.) In light of this, the ALJ's failure to include an "unskilled work" limitation in his RFC determination was harmless. *See, e.g., McAnally v. Astrue*, 241 Fed. Appx. 515, 519 (10th Cir. 2007) (concluding that ALJ's failure to include certain limitations in the RFC was harmless where the vocational expert testified that such limitations would not change the result).

Separately, substantial evidence on the record as a whole supports the ALJ's decision to exclude a "simple" work limitation from his RFC assessment. As discussed above, Martin's opinion indicated that Pearson was "capable of understanding simple instructions and procedures." (Tr. 389.) The record also includes Mental RFCAs performed by Lovell and Garfield. (Tr. 415, 452.) These Mental RFCAs indicate that Pearson had the "ability to carry out detailed instructions." (*Id*.) The ALJ gave Martin, Lovell and Garfield's opinions either "significant" or "great" weight, and when read together, these opinions are consistent with respect to Pearson's ability to understand instructions. (Tr. 22, 25.) Stated another way, Martin's opinion that Pearson is "capable of understanding simple instructions and procedures" does not mean Pearson is incapable of carrying out detailed instructions.

b. Workplace Performance and Motivation

In contrast to the omissions above, the ALJ's omission of Pearson's workplace performance and motivation limitations require a remand. Martin's opinion indicates that Pearson would occasionally have problems with workplace performance and motivation because of her depression. (Tr. 389.) This opinion is further supported by the Mental RFCAs performed by Lovell and Garfield, which show that Pearson was moderately limited in her ability to "maintain attention and concentration for extended periods," "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (Tr. 415, 452.) Again, the ALJ assigned these opinions either "significant" or "great" weight, and did not reject or discredit them. (Tr. 22, 25.) Thus, it is unclear why the ALJ adopted some of the limitations addressed in these opinions and not others. Although an ALJ is not required to explain all the evidence in the record, he is not entitled to pick and choose only those parts of the record that are favorable to a finding of nondisability. *Taylor v. Barnhart*, 333 F. Supp. 2d 846, 856 (8th Cir. 2004); *see also Confere v. Astrue*, 235 Fed. Appx. 701, 704 (10th Cir. 2007) ("An ALJ is not entitled to pick through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."); *Switzer v. Heckler*, 742 F.2d 382, 385–86 (7th Cir. 1984) (stating an ALJ cannot "pick and choose" only the evidence that supports his position). Had the ALJ included Pearson's mental limitations, his disability determination may have been different. After all, the vocational expert testified that an individual with Pearson's age, education and work experience, who also had occasional problems with workplace performance, could not perform Pearson's past relevant work or any other work. (Tr. 49-50.)

In short, the ALJ's RFC fails to capture the nuances of Pearson's mental limitations as assessed by Martin, Lovell and Garfield. Because the ALJ gave these opinions "significant" or "great" weight, and because the vocational expert testified that Pearson would not be able to work if she had occasional problems with workplace performance, the court will remand. On remand, the ALJ shall explain the evidentiary

15

basis for his RFC assessment and any reasons for excluding a limitation from that assessment.

### 4. *Remaining Arguments*

Pearson also argues that the ALJ erred in relying on vocational testimony that was inconsistent with the DOT, and erred at step five of the sequential evaluation process. (Filing 14 at CM/ECF pp. 22-26.) Because the court is remanding this matter to the ALJ for further consideration of Pearson's limitations, the ALJ's hypothetical question and analysis may change. Therefore, the court declines to address Pearson's remaining arguments.

IT IS ORDERED that:

1. The Commissioner's decision is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ shall explain the evidentiary basis for his RFC assessment and any reasons for excluding a limitation from that assessment, especially Pearson's workplace performance and motivation limitations.

2. Judgment shall be entered by separate document providing that the decision of the Commissioner is reversed and remanded.

DATED this 28th day of October, 2011.

BY THE COURT:

s/*Richard G. Kopf*
United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.